# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
Filed: October 5, 2026

* * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| PATRICK SHEDIACK, | * | |
| Petitioner, | * | No. 19-1994V |
| v. | * | Special Master Young |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| Respondent. | * | |

* * * * * * * * * * * * * * * *

*Richard Gage*, Richard Gage, P.C., Cheyenne, WY, for Petitioner.
*Mary Eileen Holmes*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

On December 30, 2019, Patrick Shediack ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program").[2] Pet., ECF No. 1. Petitioner alleged that an influenza ("flu") vaccine on December 16, 2017, caused him to suffer chronic urticaria[3] and angioedema.[4] *Id.* at 2. Petitioner alleged in the alternative, that

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Ruling will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Chronic urticaria is "urticaria that either is continuous or develops over a period of six weeks or more; most cases are idiopathic." *Chronic Urticaria*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=116399 (hereinafter "DORLAND'S"). Urticaria is "a vascular reaction in the upper dermis, usually transient, consisting of localized edema caused by dilatation and increased capillary permeability with wheals." *Urticaria*, DORLAND'S.

[4] Angioedema is "a vascular reaction involving the deep dermis or subcutaneous or submucosal tissues, representing localized edema caused by dilatation and increased permeability of capillaries, with

his December 16, 2017 flu vaccine significantly aggravated a preexisting condition leading to the development of chronic urticaria and angioedema. *Id.* On April 16, 2021, Respondent filed his Rule 4(c) report arguing that this case is not appropriate for compensation. Resp't's Rep. at 1, ECF No. 24.

After carefully analyzing and weighing the evidence presented in this case in accordance with the applicable legal standards,[5] I find that Petitioner has provided preponderant evidence that the flu vaccine he received on December 16, 2017, caused him to suffer from chronic urticaria and angioedema, which satisfies his causation-in-fact burden of proof under *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1280 (Fed. Cir. 2005). Accordingly, Petitioner is entitled to compensation.

## I. Procedural History

Petitioner filed his petition and medical records on December 30, 2019. Pet.; Pet'r's Exs. 1–8, ECF No. 1. Petitioner filed an affidavit on February 10, 2020. Pet'r's Ex. 9, ECF No. 7. Petitioner filed additional medical records on October 28, 2020, and January 15, 2021. Pet'r's Ex. 10, ECF No. 18; Pet'r's Ex. 11, ECF No. 22. On April 16, 2021, Respondent filed his Rule 4(c) report arguing against compensation. Resp't's Rep.

On December 22, 2021, Petitioner filed additional medical records. Pet'r's Ex. 12, ECF No. 38. On January 4, 2020, Petitioner filed an expert report from Vera S. Byers, M.D., Ph.D. Pet'r's Ex. 13, ECF No. 39. On July 8, 2022, Respondent filed an expert report from Andrew MacGinnitie, M.D., Ph.D. Resp't's Ex. A, ECF No. 43. Petitioner filed an expert report from Maya R. Jerath, M.D., Ph.D., on January 20, 2023. Pet'r's Ex. 19, ECF No. 49. Respondent filed a supplemental expert report from Dr. MacGinnitie on February 27, 2023. Resp't's Ex. C, ECF No. 52. Petitioner filed additional medical records on April 19, 2023. Pet'r's Ex. 22, ECF No. 53. On June 5, 2023, Petitioner filed a supplemental expert report from Dr. Jerath. Pet'r's Ex. 23, ECF No. 56. On October 2, 2023, Respondent filed a second supplemental expert report from Dr. MacGinnitie. Resp't's Ex. D, ECF No. 57. Petitioner filed a second affidavit on January 12, 2024. Pet'r's Ex. 25, ECF No. 60. On April 22, 2024, Petitioner filed a second supplemental expert report from Dr. Jerath. Pet'r's Ex. 27, ECF No. 64. On May 29, 2024, Respondent filed a third supplemental expert report from Dr. MacGinnitie. Resp't's Ex. E, ECF No. 66.

Petitioner filed a motion for a ruling on the record on September 19, 2024. Pet'r's Mot., ECF No. 70. On January 17, 2025, Respondent filed a response, and on February 24, 2025, Petitioner filed a reply. Resp't's Response, ECF No. 74; Pet'r's Reply, ECF No. 75. Petitioner

---

development of giant wheals. Urticaria is the same reaction occurring in superficial portions of the dermis." *Angioedema*, DORLAND'S.

[5] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the Decision will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

filed additional medical records on May 16, 2025. Pet'r's Ex. 33, ECF No. 76. This matter is now ripe for adjudication.

## II. Factual History

### A. Pre-Vaccination Medical Records

Petitioner was born on March 31, 1958. Pet'r's Ex. 1 at 1. Prior to vaccination, Petitioner's medical history included prostatic hyperplasia, third-degree heart block status post insertion of intracardiac pacing device, peripheral neuropathy, vitamin D deficiency, chronic low back pain, fractured fibula, hypertension, obstructive sleep apnea, morbid obesity, bursitis, frequent urination, and hematuria. *See* Pet'r's Ex. 2 at 73, 167, 567, 602, 830; Pet'r's Ex. 4 at 55, 267–69; Pet'r's Ex. 8 at 1–2.

On December 16, 2017, Petitioner received the subject flu vaccine in his left deltoid at Kettering Hospital. Pet'r's Ex. 1 at 1.

On December 19, 2017, Petitioner reported to his primary care physician ("PCP"), Sarah Hussain, M.D., for an annual physical examination. Pet'r's Ex. 4 at 275. He presented with feet swelling that he reported started after taking Flomax[6] and finasteride.[7] *Id.* He reported going to the emergency department ("ED") three weeks prior for urinary problems and was prescribed Flomax and finasteride. *Id.* He had "edema since starting Flomax." *Id.* Petitioner reported a "[s]wollen ball on bottom of left foot" that was "in the other foot the day before" (December 18, 2017). *Id.* Petitioner further reported receiving a flu shot on Saturday. *Id.* "His left hand ha[d] since swollen up and [was] red since waking up this morning." *Id.* There was also swelling on his right upper arm. *Id.* It was noted that Petitioner had "similar episodes of urticaria." *Id.* In addition to left hand swelling, review of symptoms was positive for a blister between left big toe, "[r]edness from the left hand spreading to the left forearm," and "[s]welling and hive-like rash on right inner arm." *Id.* at 276. On examination, Dr. Hussain observed edema[8] on left hand, bruise on left thumb, edema and redness on upper inner right arm, and erythema[9] of left hand and forearm. *Id.* at 277. The assessment was "[c]ellulitis[10] of left hand, spreading to the left forearm" and urticaria. *Id.* at 277. Petitioner was referred to an allergist for further evaluation. *Id.* at 277–78.

---

[6] Flomax is trademark for tamsulosin hydrochloride which is "an α1-adrenergic blocking agent specific for the receptors in the prostate; used to improve urine flow rate and reduce symptoms of benign prostatic hyperplasia." *Tamsulosin Hydrochloride*, DORLAND'S; *see also Flomax*, DORLAND'S.

[7] Finasteride is "an inhibitor of 5α-reductase, used in the treatment of benign prostatic hyperplasia and as a hair growth stimulant." *Finasteride*, DORLAND'S.

[8] Edema is "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues. It may be localized (as from venous obstruction, lymphatic obstruction, or increased vascular permeability) or systemic (as from heart failure or renal disease)." *Edema*, DORLAND'S.

[9] Erythema is "redness of the skin produced by congestion of the capillaries." *Erythema*, DORLAND'S.

[10] Cellulitis is "an acute, diffuse, spreading, edematous, suppurative inflammation of the deep subcutaneous tissues and sometimes muscle, sometimes with abscess formation. It is usually caused by infection of a wound, burn, or other cutaneous lesion by bacteria, especially group A streptococci and Staphylococcus aureus, but it may also occur in immunocompromised hosts." *Cellulitis*, DORLAND'S.

Later that evening, Petitioner presented to the ED complaining of a "sudden onset" of left-hand swelling, erythema, and tenderness to palpation that began the previous day. Pet'r's Ex. 2 at 647. Notes also indicated "[s]ymptoms started earlier this morning and progressed throughout the day." *Id.* at 654. ED notes stated, "[o]f interest, he also has an area of erythema and tenderness to his right upper arm/bicep. State[d] this area appeared at the same time that his left hand began to swell. He does endorse a flu shot to that arm [three] days ago," but he denied any other trauma or wounds to the area. *Id.* at 647, 654. On examination, Petitioner had swelling of the left hand with erythema and tenderness to palpation and erythema/rash on the right bicep. *Id.* at 652. Petitioner was admitted and underwent bloodwork. *Id.* at 652, 654, 670. An X-ray showed diffuse soft tissue swelling of the left hand. *Id.* at 653. There was no evidence of deep vein thrombosis. *Id.* at 653, 670.

While admitted, on December 20, 2017, Petitioner saw infectious disease specialist Satish Sarvepalli, M.D. Pet'r's Ex. 2 at 828. History noted Petitioner had a flu shot on December 16, 2017, "and subsequently started having significant swelling, itching on the left palm or hand which progressively started getting worse." *Id.* Petitioner "also endorse[d] "similar lesions were started on his bilateral plantar foot areas at different times the last [two] weeks which were resolving on its own." *Id.* at 829. The assessment was "[a]cute urticaria probably related to flu shot he received on 12/16. Other possible etiology could be the finasteride with development of symptoms in []his bilateral feet on the plantar surface which started prior to flu shot administration. Those areas have been resolving." *Id.* at 828. He also noticed another area of erythema on the right upper arm. *Id.* Dr. Sarvepalli also thought Petitioner had left upper extremity cellulitis. *Id.* Petitioner was on IV clindamycin every eight hours. *Id.* at 829.

Also on December 20, 2017, the hospitalist, Sylvia Polenakovik, M.D., concluded Petitioner's left side cellulitis "preceded by urticaria presumed to be due to flu shot vs finasteride." Pet'r's Ex. 2 at 671. Finasteride was discontinued. *Id.* at 674. In a follow-up consultation with Dr. Sarvepalli on December 21, 2017, Petitioner reported itching had significantly improved in his left dorsal hand and his left upper extremity, although he noticed new itching areas in his right posterior thigh. *Id.* at 664–65. Physical examination revealed "[i]mproved edema in the left upper extremity, [] erythema resolved in the left upper extremity. Left hand is less swollen. There is an area in the right plantar foot as well as right posterior thigh which is erythematous which also appears like an urticarial response." *Id.* at 665.

Petitioner was discharged on December 21, 2017, with a diagnosis of left-hand swelling extending to the left upper arm, concerning for cellulitis but appearing "more allergic in nature" following negative pro-calcitonin and significant response to diphenhydramine and famotidine. Pet'r's Ex. 2 at 673. A second diagnosis was urticaria, "most likely offending agent was recent flu shot (vs finasteride)." *Id.* The attending physician stated that the allergic reaction/urticaria was "likely [due to the] flu shot but could also be finasteride reaction" and recommended that Petitioner "not pursue flu shot administration in the future." *Id.* at 677.

On December 26, 2017, Petitioner saw his PCP for a post-hospitalization follow-up. Pet'r's Ex. 4 at 296. Petitioner reported his current medications as diphenhydramine, loratadine, famotidine, and prednisone. *Id.* at 295. Petitioner's PCP wrote that Petitioner was hospitalized for

cellulitis of the left hand but "was discharged after it was found he did not have cellulitis, but an allergic reaction." *Id.* at 296. "It is suspected his allergic reaction was to the flu vaccination or starting finasteride since those events happened just prior to symptoms onset." *Id.* The physical examination was normal without swelling, rash, or erythema. *Id.* at 297. He was referred to an allergist. *Id.*

Throughout much of 2018, Petitioner continued to seek treatment for his chronic urticaria and angioedema. His symptoms were being treated by his PCP with antihistamines and oral steroids and recurred when either medication was discontinued. Pet'r's Ex. 4 at 319–20 (1/13/2018 visit for hand swelling), 333–35 (2/8/2018 visit for thumb swelling and lesions), 359–61 (2/13/2018 visit for pruritic rash on right upper arm and right thigh); *see also* Pet'r's Ex. 2 at 907–15 (1/26/2018 ED visit for groin welts, hand and lip swelling), 1067 (8/22/2018 ED visit for right eyelid swelling following discontinuation of antihistamine). During this period, Petitioner's diagnosis was often recorded as chronic urticaria, angioedema, and serum sickness[11] secondary to flu vaccine and/or finasteride. Pet'r's Ex. 2 at 915, 1067; Pet'r's Ex. 4 at 320, 361.

In addition to being under the care of his PCP, Petitioner sought treatment from allergist Arturo Bonnin, M.D.[12] *See* Pet'r's Ex. 6. Petitioner had an initial consultation with Dr. Bonnin on February 7, 2018, for "evaluation of possible vaccine reaction." *Id.* at 1. Dr. Bonnin recorded Petitioner's history to include his December 16, 2017 flu vaccination and "[t]wo days later his hands started itching and they turned red. The following day the hands [were] swollen." *Id.* Petitioner thought "that maybe the flu shot wasn't sterile from the factory." *Id.* Dr. Bonnin reviewed Petitioner's hospitalization. *Id.* Flu vaccine was listed as an allergy. *Id.* at 2. The symptoms indicating reaction included cellulitis, hives, itching, swelling, and rash. *Id.* On examination, Petitioner was free of any skin rash but had tenderness and redness in the proximal and distal joints of both thumbs. *Id.* at 4. Dr. Bonnin diagnosed a possible vaccine reaction, stating, "[m]y hypothesis is that he had and perhaps keeps having serum sickness from his flu vaccine." *Id.* at 5. Dr. Bonnin wrote,

> Allergy testing for Type IV hypersensitive reactions[13] to vaccines is not available to my knowledge. Therefore, even though we could be wrong and the [reaction] was not from his vaccination, he would have to avoid taking [flu] vaccinations in

---

[11] Serum sickness is "a hypersensitivity reaction to the administration of foreign serum or serum proteins characterized by fever, urticaria, arthralgia, edema, and lymphadenopathy. It is caused by the formation of circulating antigen-antibody complexes that are deposited in tissues and trigger tissue injury mediated by complement and polymorphonuclear leukocytes." *Serum Sickness*, DORLAND'S. "Serum sickness is classed with the Arthus reaction and other immune complex diseases as a type III hypersensitivity reaction." *Id.*

[12] Petitioner also saw nephrologist Siva Ambalavaman, M.D. *See* Pet'r's Ex. 5. Petitioner reported a "delayed allergic reaction to flu vaccination" "in the form of swelling of his upper extremity and skin rash." *Id.* at 5–6. Dr. Ambalavaman noted Petitioner had a "presumed diagnosis of serum sickness presenting with persistent proteinuria." *Id.* at 5. Dr. Ambalavaman "could not find any previous urine analysis to see whether this is a long-standing issue related to obesity and metabolic syndrome versus related to recent allergic reaction." *Id.*

[13] Type IV hypersensitivity reaction is "hypersensitivity initiated by antigen-specific T lymphocytes; unlike forms mediated by antibodies, it takes [one] day or more to develop and can be transferred by lymphocytes but not by serum." *Type IV Hypersensitivity*, DORLAND'S.

> the future, until [flu] vaccine components are completely different. Perhaps when cultures are done using human cells, instead of chickens. Or perhaps universal vaccines that by using a different technology, the molecules use are completely different.

*Id.* Laboratory tests ordered by Dr. Bonnin showed normal or negative values for complement C3, complement C4, ANA titers, immune complex detection, cryoglobulin screen, and Raji cell immune complex test and sedimentation rate was 38 mm/hour (reference range 0-20). *Id.* at 11.

Petitioner saw Dr. Bonnin again on February 20, 2018, for proteinuria, "[v]accine reaction follow-up," and serum sickness. Pet'r's Ex. 6 at 7. Petitioner reported that his symptoms had improved while taking prednisone and antihistamines. *Id.* Petitioner returned to Dr. Bonnin on March 7, 2018. *Id.* at 13. This visit indicated he was there for "[d]rug reaction," serum sickness, and "[v]accine reaction follow-up." *Id.* Petitioner reported continued improvement of symptoms albeit with intermittent hand swelling and occasional itching. *Id.* Dr. Bonnin wrote, "[t]he patient has received their annual flu shot [December 16, 2017]. Precisely that is what trigger[ed] his current problems." *Id.*

During an April 24, 2018 follow-up with Dr. Bonnin, Petitioner reported only experiencing one "flareup" since his last visit, which occurred when he did not take a dose of antihistamine on time. Pet'r's Ex. 6 at 18. Dr. Bonnin recommended Petitioner continue with prednisone 2.5 mg daily. *Id.* When Petitioner returned to Dr. Bonnin on June 20, 2018, he reported that he was doing well with pain in only one index finger. *Id.* at 23. The next follow-up appointment with Dr. Bonnin was on August 15, 2018. *Id.* at 28. Petitioner reported feeling well, although he continued to experience intermittent symptoms. *Id.* Dr. Bonnin stated: "I told the patient that if between today and his next visit with me in 10 weeks, the doctors at Mayo Clinic want to keep tapering down his Prednisone dose, to follow their recommendations. He will be seen by Dr. Li at Mayo, which is national allergy leader." *Id.* at 32.

On September 11, 2018, Petitioner was seen at the Mayo Clinic by allergist-immunologist James Li, M.D., Ph.D., "for evaluation of swelling and possible flu shot reaction." Pet'r's Ex. 3 at 24. Dr. Li notated that Petitioner received the flu vaccine on December 16, 2017, and 46 hours later, he developed itching on his palms. Over the next one to two days, "this developed into significant swelling" in his left hand. *Id.* While it was initially considered cellulitis, it was later determined not to be cellulitis. *Id.* "This was considered an adverse reaction to the [flu] immunization." *Id.* Dr. Li noted Petitioner tolerated previous flu vaccinations without problem. *Id.* at 25. On examination, Petitioner had small patches of erythema on both feet but there was no urticaria or angioedema. *Id.* The impression was swelling, joint, pain, and rash. *Id.* Differential diagnosis included angioedema. *Id.* "An adverse reaction to the [flu] vaccine was considered a leading consideration, but this diagnosis cannot be made with certainty." *Id.* Dr. Li recommended dermatology and rheumatology consultations. *Id.* Laboratory tests from this visit showed normal or negative results for CBC with differential, C-reactive protein, IgE, anti-thyroid peroxidase, C1 esterase inhibitor, sedimentation rate, and chronic urticaria index. *Id.* at 9–19. There was an abnormal serum protein electrophoresis which proved to be IgM with a lambda light chain. *Id.* at 16. The serum tryptase was also elevated at 18.1 ng/mL (normal less than 11.5). *Id.*

At a follow-up visit on September 13, 2018, Dr. Li diagnosed Petitioner with angioedema and urticaria, that "may be related to his previous [flu] immunization," but noted "this link cannot be made with certainty at this time." Pet'r's Ex. 3 at 55. Dr. Li referred Petitioner to a hematologist for evaluation of his abnormal monoclonal protein results and elevated serum tryptase. *Id.*

Petitioner had additional consultations at the Mayo Clinic on September 13, 2018. Pet'r's Ex. 3 at 92. He was seen by dermatologist Catherine Newman, M.D., for evaluation of a rash on his feet.[14] *Id.* History stated Petitioner was seeking a second opinion "regarding a possible reaction to a[ flu] immunization." *Id.* Petitioner reported that these spots developed "shortly after" the flu vaccine. *Id.* 93. The diagnosis was pigmented purpuric dermatosis,[15] and no therapy was necessary other than compression socks. *Id.* at 94.

That same day at the Mayo Clinic, Petitioner saw rheumatologist Shreyasee Amin, M.D. Pet'r's Ex. 3 at 106. History noted Petitioner's symptoms started three days after he received a flu vaccine in December 2017. *Id.* He had prior flu vaccinations without difficulty. *Id.* Petitioner reported that he was taking 2.5 mg of prednisone daily and antihistamines, but when he discontinued the antihistamines, he experienced exacerbated recurrent hand swelling. *Id.* at 107. Petitioner's physical examination showed rash on the ankles and "fullness" of the parotid glands bilaterally. *Id.* at 109. Dr. Amin could "not elicit any clear inflammatory joint symptoms." *Id.* She noted the elevated tryptase level and the fact that the serum protein electrophoresis was pending. *Id.* Following additional lab work, Dr. Amin ruled out inflammatory arthritis, inflammatory bowel disease, Sjogren's syndrome, and connective tissue diseases. *Id.* The diagnosis was angioedema, and Dr. Amin noted that urticarial vasculitis[16] was in the differential, although there were no skin lesions at the time. *Id.* Dr. Amin later clarified that she could find no clear underlying autoimmune rheumatologic condition to account for Petitioner's clinical picture. *Id.* at 110; Pet'r's Ex. 10 at 124.

As recommended by Dr. Li, Petitioner had a hematology/oncology consultation with Alejandro Calvo, M.D., on October 16, 2018. Pet'r's Ex. 10 at 2. Dr. Calvo reviewed Petitioner's abnormal monoclonal protein results and noted Petitioner's reported reaction to the flu shot to be a "very unusual occurrence." *Id.* Dr. Calvo opined that Petitioner's abnormal monoclonal protein could be "completely unrelated to his allergy/immunology problem, in that case would be consistent with [monoclonal gammopathy of undetermined significance ("MGUS")[17]]. On the other hand, he could be dealing with an underlying lymphoproliferative disorder that could be somehow related to his unusual allergic reaction/angioedema." *Id.* at 7. He recommended Petitioner undergo a bone marrow biopsy and radiographs to evaluate for presence of adenopathy

---

[14] This is the first documented complaint of this symptom.

[15] Pigmented purpuric dermatosis refers to "any of a group of benign dermatoses of unknown etiology, not associated with underlying systemic disease, consisting of minimal inflammation with cayenne pepper spots on the skin." *Chronic Pigmented Purpura*, DORLAND'S. Dermatosis is "any skin disease, especially one not characterized by inflammation." *Dermatosis*, DORLAND'S.

[16] Vasculitis is "inflammation of a blood or lymph vessel." *Vasculitis*, DORLAND'S.

[17] MGUS is "the presence of a serum M component without signs or symptoms of multiple myeloma, Waldenström macroglobulinemia, or other plasma cell neoplasms." *Benign Monoclonal Gammopathy*, DORLAND'S. Gammopathy is "a condition marked by disturbed immunoglobulin synthesis." *Gammopathy*, DORLAND'S.

and referred to Petitioner's localized edema/angioedema/urticaria as being "an unusual allergy to flu shot." *Id.*

Petitioner followed up with Dr. Bonnin on October 24, 2018. Pet'r's Ex. 6 at 34. Petitioner's blood work in preparation for this visit showed elevated tryptase of 21 ng/mL (normal less than 11) and serum immunofixation was positive for a monoclonal IgM-lambda protein. *Id.* at 33. Dr. Bonnin noted that Petitioner's arthritic symptoms had resolved, and he suspected that Petitioner's elevated serum tryptase was secondary to a myeloproliferative process. *Id.* at 34, 37–38.

Petitioner underwent a comprehensive computed tomography ("CT") scan on October 26, 2018, to evaluate his monoclonal gammopathy. Pet'r's Ex. 2-1 at 1135. His chest showed a 5 mm subpleural opacity within the posterior aspect of the right lower lobe, which could represent a focal area of atelectasis versus underlying pulmonary nodule. *Id.* at 1136. There was a sclerotic lesion within the leftward aspect of the T9 vertebral body but no acute abdominal or pelvic abnormality. *Id.* Petitioner's prostate was found to be heterogeneously enlarged. *Id.*

On October 29, 2018, Petitioner had a bone marrow biopsy to evaluate his monoclonal IgM gammopathy. Pet'r's Ex. 2-1 at 1194. A small monotypic plasma cell population was identified, consistent with involvement by a plasma cell neoplasm. *Id.* In addition, there was a small population of monotypic B cells identified as likely representing a monoclonal B lymphocytosis of the chronic lymphatic leukemia ("CLL") phenotype. *Id.* The plasma cells were lambda restricted. *Id.* at 1196. These findings were diagnostic of a low-level involvement by plasma cell neoplasm. *Id.*

On November 27, 2018, Petitioner returned to Dr. Calvo to review his laboratory and CT results. Pet'r's Ex. 10 at 18. Repeat serum protein electrophoresis showed that the monoclonal IgM-lambda protein IgG was 638 mg/dl (reference range 700-1600), and IgM was 1636 mg/dl (reference rage 20-172). *Id.* Dr. Calvo noted Petitioner's recurrent angioedema and urticaria "was triggered by receiving a flu shot." *Id.* at 18, 21. Dr. Calvo pointed out that there are "documented cases of monoclonal gammopathy with monoclonal immunoglobulins acting as acquired C1 inhibitor deficiency." *Id.* at 21. Dr. Calvo noted that Petitioner should undergo repeat tests for serum protein electrophoresis and quantitative immunoglobulins in twelve weeks and stated that he would contact Dr. Bonnin and Dr. Li at the Mayo Clinic "regarding their thoughts about treating his monoclonal B cells/plasma cell population to prevent additional bouts of angioedema." *Id.*

On January 18, 2019, Petitioner's prednisone dose was increased to 5 mg daily following incidents of hand swelling when Petitioner tried to decrease his dose to 1 mg daily. Pet'r's Ex. 6 at 40, 44. Petitioner saw Dr. Bonnin in a follow-up on January 24, 2019. *Id.* at 45. The record from this visit notes that Dr. Bonnin speculated that the "[e]levat[ion] of serum tryptase in the presence of MGUS is probably related [] to an increase in complement activation." *Id.* at 48. He further opined that "[p]ersistent arthritis [a] month after a vaccine reaction, in [his] opinion[,] is related to his MGUS, and perhaps entirely secondary to it at this point." *Id.* "MGUS related arthritis. The confirmation of this hypothesis would require the characterization by electron microscope of monoclonal IgM lambda in his hand joints, where he has been complaining of pain and swelling

since the reaction to the [flu] vaccine." *Id.* Dr. Bonnin then reduced Petitioner's dose of prednisone to 1 mg daily, with increases to 20 mg for flares. *Id.*

On February 26, 2019, Petitioner saw Dr. Calvo with complaints of multiple episodes of angioedema whenever he tried to taper his prednisone below 2.5 mg. Pet'r's Ex. 10 at 24. Dr. Calvo recommended a course of treatment with Rituximab ("Rituxan"). *Id.* at 25. Petitioner had a follow-up with Dr. Calvo on April 16, 2019, after completing the recommended course of Rituxan infusions. *Id.* at 30–31. Petitioner reported that he experienced intermittent rashes and angioedema requiring transient increases in his daily dose of 2.5 mg of prednisone. *Id.* at 31, 33. On examination, Petitioner was free of rashes and angioedema. *Id.* at 31. Dr. Calvo noted that Petitioner had monoclonal population of B lymphocytes consistent with low-grade non-Hodgkin lymphoma and recommended a return visit in six months. *Id.* at 32–33. Dr. Calvo continued to list his assessment of recurrent angioedema and urticaria "triggered by receiving a flu shot." *Id.* at 33.

Petitioner returned to Dr. Bonnin on July 10, 2019, having completed four rounds of Rituxan. Pet'r's Ex. 6 at 49. Petitioner reported that his right-hand arthritis and hand swelling continued to occur intermittently. *Id.* Dr. Bonnin recommended that Petitioner take 2.5 mg prednisone every other day for one month and ordered repeat bloodwork for tryptase as well as autoimmune and immune complex disorders.[18] *Id.* at 53.

On September 25, 2019, Petitioner saw Dr. Bonnin and reported continued episodes of hives and angioedema requiring prednisone despite using antihistamines. Pet'r's Ex. 11 at 7. Under assessment, Dr. Bonnin added "chronic idiopathic urticaria" and "angioedema" to the standing "adverse effect of vaccine, sequela." *Id.* at 11. Dr. Bonnin prescribed Xolair. *Id.* Petitioner received his first Xolair injection on October 14, 2019. *Id.* at 14.

Petitioner returned to Dr. Calvo on October 28, 2019, reporting an 80% reduction in angioedema episodes. Pet'r's Ex. 10 at 36–37. He stated he was no longer taking prednisone daily and instead relied on 20 mg doses as needed for angioedema episodes about twice a month. *Id.* at 27. On November 27, 2019, Petitioner saw Dr. Bonnin and reported that his symptoms were improving since starting on Xolair. Pet'r's Ex. 11 at 13. The assessment remained "adverse effect of vaccine, sequela," "angioedema," "chronic idiopathic urticaria," and "vaccine reaction." *Id.* at 17.

On April 21, 2020, Petitioner returned to Dr. Calvo and reported that since he had started Xolair therapy, his angioedema had "disappeared." Pet'r's Ex. 10 at 42–43. He was off prednisone and was tapering his antihistamine. *Id.* at 43. Petitioner followed up with Dr. Bonnin in November 2020 during which he reported his angioedema was well controlled with the Xolair treatment. *See* Pet'r's Ex. 11 at 18–21, 123–27. As of April 2023, Petitioner was continuing Xolair. Pet'r's Ex. 22 at 2.

[18] A September 5, 2019 test, ordered by Dr. Bonnin, showed that Petitioner has an extra allelic copy of the gene for alpha-tryptase. Pet'r's Ex. 7 at 1. This condition is called hereditary alpha-tryptasemia ("HaT"). *Id.* On September 25, 2019, Dr. Bonnin notated: "I wonder if there is another reason why this patient has elevated level of tryptase besides the newly diagnosed [HaT]. Systemic mastocytosis [] associated with monoclonal gammopathy has been reported." Pet'r's Ex. 11 at 11.

## III. Petitioner's Statements

Petitioner filed an affidavit dated January 28, 2020, and a declaration dated January 11, 2024. Pet'r's Exs. 9, 25. In his initial statement, he recalled the events following his vaccination. Pet'r's Ex. 9. He received the flu vaccine on December 16, 2017, and "[w]ithin a few days," developed "red marks on [his] hands and they became swollen and itchy." *Id.* at ¶¶ 3–4. He also noticed a rash "forming on [his] body." *Id.* at ¶ 4. He went to his PCP who sent him to the ED where he was diagnosed with urticarial rash with angioedema. *Id.* at ¶ 5. His treating allergist/immunologist thought "this might possibly be serum sickness due to the flu vaccine." *Id.* Petitioner takes prednisone and Allegra to control flare-ups, although his last flare-up was late October 2019. *Id.* at ¶ 6.

Petitioner later filed a declaration that went into further detail. Pet'r's Ex. 25. He recalled that in the morning of December 18, 2017, while at work, he noticed the palm of his left hand "began itching incessantly." Pet'r's Ex. 25 at ¶ 3. He washed his hands several times, but the itching continued, and he took Benadryl that night. *Id.* at ¶¶ 3–4. While he was getting ready for work the next morning, on December 19, 2017, his wife noticed his swollen left hand and wanted him to see his doctor. *Id.* at ¶ 5. His PCP, Dr. Hussain, told him he "might have an infection and that this was an emergency situation" and to go to the ED. *Id.* at ¶ 6. Petitioner explained that at that visit with his PCP, Dr. Hussain recorded that Petitioner had similar episodes of urticaria in the past. *Id.* at ¶ 7. Petitioner explained that when he "reported this to Dr. Hussain[, he] was referring to an incident in 1999 or 2000 when [he] was given the drug Duricef and had an allergic reaction." *Id.* Duricef is in his Medic Alert Emergency Medical Information Record. *Id.*; Pet'r's Ex. 26.

## IV. Expert Reports

### A. Expert Qualifications

#### 1. Petitioner's Expert, Vera S. Byers, M.D., Ph.D.

Dr. Byers is board certified in internal medicine. Pet'r's Ex. 14 at 1. She received her M.D. from the University of California at San Fransico, and her Ph.D. in immunology from the University of California at Los Angeles. *Id.* at 3. She also completed an internal medicine residency and an immunology fellowship at the University of California, San Fransico. *Id.* at 3–4. Dr. Byers is currently a medical toxicologist and clinical immunologist at the University of California, San Fransico. *Id.* at 1–2, 5.

#### 2. Petitioner's Expert, Maya R. Jerath, M.D., Ph.D.

Dr. Jerath is board certified in allergy and immunology. Pet'r's Ex. 19 at 1. She received her M.D. from University of Vermont College of Medicine, and her Ph.D. in biomedical engineering from University of Texas as Austin. Pet'r's Ex. 20 at 1. She completed a residency in internal medicine at Duke University, and a fellowship in allergy and Immunology at the University of North Carolina at Chapel Hill. Pet'r's Ex. 19 at 1. She is currently a Professor of Medicine at Washington University in Saint Louis and Clinical Director for the Division of Allergy

and Immunology in the Department of Medicine. *Id.* In addition to her clinical practice she conducts research, "including on vaccine reactions." *Id.*

### 3. Respondent's Expert, Andrew MacGinnitie, M.D., Ph.D.

Dr. MacGinnitie is board certified in allergy and immunology. Resp't's Ex. A at 2. He received his M.D. and his Ph.D. in pathology from the University of Chicago Pritzker School of Medicine. Resp't's Ex. B at 1. He completed a pediatrics residency in the Boston Combined Residency Program training at Boston Children's Hospital and Boston Medical Center, followed by an allergy/immunology fellowship at Boston Children's Hospital. Resp't's Ex. A at 1. He is currently an Attending Physician as well as the Clinical Chief for the Division of Immunology at Boston Children's Hospital. *Id.* Dr. MacGinnitie maintains an "active clinical practice, typically seeing more than 1,600 patients annually, and have extensive experience in caring for children and adults with a variety of immunologic diseases including reactions to vaccines." *Id.* at 2. He regularly sees patients with chronic urticaria and angioedema. *Id.*

## B. Expert Reports

### 1. Dr. Byers[19]

Dr. Byers agreed with Petitioner's treating physicians that the proper diagnoses are chronic or "long standing" urticaria and angioedema. Pet'r's Ex. 13 at 6. She opined Petitioner's urticaria and angioedema were triggered by his December 2017 flu vaccine. *Id.* She said, "the immune challenge from the [flu] vaccine[] caus[ed] an autoimmune reaction generating IgE." *Id.* She opined Petitioner "was susceptible to this reaction due to his monoclonal IgM lambda gammopathy which promotes complement activation and by the Tyrosinemia which is thought to destabilize mast cells, which can promote swelling." *Id.* Dr. Byers wrote that the onset of three days "is an appropriate time interval in this previously flu vaccinated individual." *Id.* She explained that since Petitioner had previously received flu vaccines, he was "well primed to produce a flood of cytokines to activate a variety of autoimmune reactions." *Id.*

Dr. Byers listed Abu-Shakra et al.[20] and Toplak et al.[21] as evidence of "multiple reports" of flu vaccination causing chronic urticaria "produced by autoimmune reactions." Pet'r's Ex. 13 at 6. Abu-Shakra et al. studied 24 women with systemic lupus erythematosus ("SLE") who received flu vaccines and subsequently developed IgG and IgM anticardolipin antibodies. Pet'r's Ex. 15 at 1. The authors concluded that flu vaccines for patients with SLE "may trigger the generation of autoantibodies," but this "effect is usually short term and has no clinical significance." *Id.* Toplak et al. studied autoimmune responses following flu vaccination in 92 healthy adults. Pet'r's Ex. 16 at 1. They measured antibodies before flu vaccination, and one month

---

[19] Petitioner does not appear to rely on Dr. Byers' opinions in his motion for a ruling on the record. *See* Pet'r's Mot. at 23.
[20] M. Abu-Shakra et al., *Influenza Virus Vaccination of Patients with SLE: Effects on Generation of Autoantibodies*, 21 CLINICAL RHEUMATOLOGY 369 (2002).
[21] N. Toplak et al., *Autoimmune Response Following Influenza Vaccination*, 6 PEDIATRIC RHEUMATOLOGY P146 (2008).

and six months post vaccination. *Id.* The study found "no statistically significant difference in the percentage of positive antibodies before and after [flu] vaccination." *Id.* However, the authors concluded that their study "clearly demonstrated induction of autoantibodies production in selected subjects." *Id.*

**2. Dr. MacGinnitie's First Report**

In Dr. MacGinnitie's first expert report, he described urticaria, angioedema, and HaT. Resp't's Ex. A at 6–8. Urticaria is a "skin disorder characterized by development of itchy, raised lesions, often with serpiginous borders." *Id.* at 6. It typically lasts 24 hours. When present for six weeks or longer, it is said to be chronic. *Id.* No underlying trigger is found in most cases and is therefore termed chronic idiopathic urticaria ("CIU"). *Id.* "The cause of CIU is not fully understood but is generally believed to be due to increased release of histamine and other mediators from mast cells in the epidermis (outer layer of the skin)." *Id.* (citing Resp't's Ex. A, Tab 1).[22] "This leads to increased permeability of the blood vessels and edema in the skin." *Id.* "A fraction of patients have antibodies directed against a receptor on the surface of mast cells called FCεR1 (which binds to IgE) or to IgE itself (which is bound to FCεR1 on the mast cell surface)." *Id.* (citing Resp't's Ex. A, Tab 1 at 4–5). It is the "[b]inding of these antibodies to the mast cells" that is thought "to contribute to their overreaction." *Id.* Angioedema is "swelling of the skin due to accumulation of fluid (edema) in the dermis, one layer deeper than in urticaria. It is often caused by release of histamine, like urticaria. Chronic urticaria and angioedema represent [two] aspects of the same disease process." *Id.* at 7 (citing Resp't's Ex. A, Tab 2).[23]

HaT involves tryptase which is "a protein released from mast cells both at baseline and upon activation." Resp't's Ex. A, Tab 7. "Increased . . . alpha tryptase gene copies at one location in the genome lead to higher baseline levels of tryptase in affected individuals, which is called HaT." *Id.* (citing reference 4).[24] According to Dr. MacGinnitie, it was initially thought that HaT was associated with "various allergic symptoms such as hives, flushing, and anaphylaxis," however, he argued that "recent studies show no obvious symptoms in most patients with elevated tryptase levels due to HaT." *Id.* (citing Resp't's Ex. A, Tab 5).[25] Chollet & Akin found HaT is not associated with any specific clinical phenotypes. Resp't's Ex. A, Tab 5 at 1.

Here, Dr. MacGinnitie concluded that Petitioner's "underlying diagnosis is [CIU] and angioedema [], with his symptoms more on the angioedema end of the spectrum and less urticaria, although he certainly had both at various times." Resp't's Ex. A at 8, 9 ("[Petitioner] suffered from CIU with a significant component of angioedema and also has [HaT]."). Dr. MacGinnitie based

---

[22] Jonathan A. Bernstein et al., *The Diagnosis and Management of Acute and Chronic Urticaria: 2014 Update*, 133 J. ALLERGY & CLINICAL IMMUNOLOGY 1270 (2014).
[23] David M. Lang, *Evidence-Based Diagnosis and Treatment of Chronic Urticaria/Angioedema*, 35 ALLERGY & ASTHMA PROCS. 10 (2014).
[24] Dr. MacGinnitite cited O'Connell & Lyons as reference 4; however, it was never filed as an exhibit. MP O'Connell & JJ Lyons, *Resolving the Genetics of Human Tryptases: Implications for Health, Disease, and Clinical Use as a Biomarker*, 22 CURRENT OP. ALLERGY & CLINICAL IMMUNOLOGY 143 (2022).
[25] Madeleine B. Chollet & Cem Akin, *Hereditary Alpha Tryptasemia is Not Associated with Specific Clinical Phenotypes*, 149 J. ALLERGY & CLINICAL IMMUNOLOGY 728 (2022).

this off his reading of the medical record, which he summarized as follows. Petitioner was noted to have angioedema "starting several weeks" before the flu vaccine at issue. *Id.* at 8. He subsequently developed "significant swelling, redness and tenderness of his hands and, to a lesser extent, feet." *Id.* He was admitted to the hospital and treated with antibiotics for presumed cellulitis. *Id.* "However, it was eventually felt that his symptoms were more consistent with an allergic process, rather than an infectious one." *Id.* Petitioner's workup revealed a "significantly elevated IgM level, which was eventually diagnosed as a myeloproliferative disorder and treated with rituximab." *Id.* He was later started on omalizumab which resolved Petitioner's remaining symptoms. *Id.*

Dr. MacGinnitie noted Petitioner's response to therapy was typical for CIU. Resp't's Ex. A at 8. He pointed out that Petitioner's "partial response to rituximab" is significant because "many patients with CIU have IgG antibodies against proteins on the surface of mast cells; thus rituximab may improve CIU symptoms by lowering the level of these anti-mast cell antibodies." *Id.* Dr. MacGinnitie did not believe that "serum sickness, if present at all, played any role in [Petitioner's] ongoing symptoms." *Id.* at 9.

Dr. MacGinnitie understood Dr. Byers' theory to be cytokine production. Resp't's Ex. A at 1. However, he argued she did not provide details of her theory, beyond stating that having received three previous doses of flu vaccines, Petitioner was "well primed to produce a flood of cytokines to activate a variety of autoimmune reactions." *Id.* at 9 (quoting Pet'r's Ex. 13 at 6).

Before taking issue with Dr. Byers' proposed theory, Dr. MacGinnitie first explained that the pathophysiology of CIU "is due to overactivation of mast-cells in the skin." Resp't's Ex. A at 10. He cited Bernstein et al., which found mast cell activation and degranulation are likely involved in urticaria and angioedema. *See generally* Resp't's Ex. A, Tab 1. As implied by the name, Dr. MacGinnitie stated CIU is an idiopathic disorder, "meaning no cause is typically found for it." Resp't's Ex. A at 10. He cited the 2014 Lang article which found at least 80% of cases have no identified trigger. *Id.* (citing Resp't's Ex. A, Tab 2). He also pointed out that the United States and European consensus statements on CIU do not identify vaccination as a trigger. *Id.* (citing Resp't's Ex. A, Tab 1; Pet'r's Ex. 28).[26] The consensus statements identified food, drugs, stress, cold, infectious diseases, and chronic inflammatory processes as potential triggers. *See generally* Resp't's Ex. A, Tab 1; Pet'r's Ex. 28.

According to Dr. MacGinnitie, "[t]he exact mechanism is not known but in some cases is due to antibodies against proteins on the mast cell surface." Resp't's Ex. A at 10. He further opined that while "cytokines are likely involved and may serve to 'prime' mast cells, Dr. Byers provides no details connecting vaccination and mast cell activation." *Id.* For example, Dr. MacGinnitie described cytokines as a "diverse group of more than 60 molecules that act to signal between different cells and orchestrate the immune response, with different cytokines, for example, having pro and anti-inflammatory effects." *Id.* (citing Resp't's Ex. A, Tab 11).[27] Dr. MacGinnitie pointed

---

[26] Torsten Zuberbier et al., *The International EACI/GA$^2$LEN/EuroGuiDerm/APAAACI Guideline for the Definition, Classification, Diagnosis, and Management of Urticaria*, 77 ALLERGY 734 (2022).
[27] Mubeccel Akdis et al., *Interleukins (from IL-1 to IL-38), Interferons, Transforming Growth Factor β, and TNF-α: Receptors, Functions, and Roles in Diseases*, 138 J. ALLERGY & CLINICAL IMMUNOLOGY 984 (2016).

out that Dr. Byers provided "no specifics of which cytokines might [be] part of this 'flood,' nor how they might lead to autoimmunity." *Id.* And Dr. MacGinnitie added that Dr. Byers provided "no evidence or theory that the temporary generation of cytokines by [a flu] vaccine could trigger (or lead to permanent worsening) of CIU." *Id.* at 9. Dr. MacGinnitie explained that cytokines are generally "short-lived molecules," which is inconsistent with Petitioner's "prolonged disease." *Id.* at 10. While Dr. MacGinnitie then agreed with Dr. Byers that vaccination can trigger cytokine production, the adverse effects, consisting of mild, local swelling and pain, are short-lived and typically resolve "within a few days." *Id.*

Dr. MacGinnitie also took issue with the references Dr. Byers used to support her opinion that flu vaccine can trigger CIU. Resp't's Ex. A at 10–11. He noted Abu-Shakra et al. focused on individuals already diagnosed with SLE, "a distinct disease," making it "of unclear relevance to [Petitioner's] case." *Id.* at 10. He noted that Toplak et al., as submitted by Dr. Byers, was "an abstract of a poster presentation from 2008 making its findings hard to assess." *Id.* However, Dr. MacGinnitie located and referenced the corresponding publication. *Id.* (citing Resp't's Ex. A, Tab 14).[28] He explained the article examined the presence of autoantibodies in healthy adults after flu vaccination and found no "statistically significant" difference in the presence of antibodies before and after vaccination. *Id.* at 10–11. Additionally, none of the participants "developed any clinical signs of autoimmune disease." *Id.* at 11. Nonetheless, he added that without a control group, "it is impossible to say whether some of these changes might have occurred independent of vaccination (e.g. random variation)." *Id.* Finally, Dr. MacGinnitie noted that "these authors examined whether pre-existing immunity to [flu] influenced changes in autoantibodies and found no relation, in contrary to Dr. Byers' assertion that [Petitioner's] receipt of previous [flu] vaccines predisposed him to autoimmune reactions to vaccination." *Id.* In sum, Dr. MacGinnitie argued that neither of the references used by Dr. Byers examined CIU "or looked for the presence of specific autoantibodies associated with CIU." *Id.*

Dr. MacGinnitie believed Petitioner's urticaria and angioedema started before his vaccination. Resp't's Ex. A at 10. The December 19, 2017 visit, three days after vaccination, noted Petitioner had angioedema on his feet for several weeks and that he had episodes of urticaria in the past. *Id.* (citing Pet'r's Ex. 4 at 275). Dr. MacGinnitie opined, "[i]t is not possible for a vaccination to trigger symptoms which started before it was administered." *Id.* He took the position that the providers who attributed Petitioner's CIU and angioedema to vaccination "were likely unaware that symptoms started before vaccination given the history provided to them." *Id.* at 11. Dr. MacGinnitie further noted that Dr. Bonnin "concluded in his final note that [Petitioner] should receive [flu] vaccination, suggesting he ultimately came to believe it was not a trigger for [Petitioner's] symptoms." *Id.* (citing Pet'r's Ex. 11 at 26).

Dr. MacGinnitie also asserted that "there is no evidence of autoimmunity in this case." Resp't's Ex. A at 11. He pointed out that roughly half of the cases of CIU are associated with autoantibodies, but these were never looked for in [Petitioner]." *Id.* Moreover, in contrast to Dr. Byers, Dr. MacGinnitie argued that neither monoclonal IgM gammopathy nor HaT significantly increases the risk of CIU. *Id.* (citing Resp't's Ex. A, Tab 5).

---

[28] N. Toplak et al., *Autoimmune Response Following Annual Influenza Vaccination in 92 Apparently Healthy Adults*, 8 AUTOIMMUNITY REVS. 134 (2008).

### 3. Dr. Jerath's First Report

In Dr. Jerath's first expert report, she explained that "urticaria (hives) and angioedema (swelling) are the result of mast cell degranulation (release of stored chemicals). Mast cells are part of the immune system. When appropriately signaled, they release chemicals, including histamine, that cause the symptoms of itching, redness, and swelling." Pet'r's Ex. 19 at 1. "Vaccines, by definition, stimulate the immune system and while the literature on their role in triggering urticaria/angioedema was scant in the past, the largescale roll out of the COVID vaccines allowed for an observation of this phenomenon." *Id.* Dr. Jerath described how she "personally saw patients who developed these symptoms in the days following vaccination" and cited Magen et al.[29] as corroboration. *Id.* She added that when hives and/or swelling occur for more than six weeks, it is called "chronic spontaneous urticaria ["CSU")]/angioedema." *Id.* at 1–2. "The term 'spontaneous' is used as in most cases, a specific cause cannot be identified." *Id.* at 2.

Dr. Jerath then summarized Petitioner's history to explain her opinion. Pet'r's Ex. 19 at 2. She first noted that Petitioner previously tolerated seasonal flu vaccines "without difficulty." *Id.* She then listed the following events from Petitioner's clinical course and their significance:

- Petitioner had a history of "self-limited" urticaria as well as swelling prior to the 2017 flu vaccine "that was potentially attributed to finasteride[;]" consequently, Dr. Jerath opined that Petitioner had "underlying episodic urticaria and angioedema." *Id.*
- Petitioner was subsequently diagnosed with HaT, "the clinical significance of which is unknown." *Id.* Dr. Jerath wrote that the "literature on this is mixed and it is not known if HaT predisposes a person to mast cell-based disease or not." *Id.* She agreed with Dr. MacGinnitie that "we can put this finding aside." *Id.*
- Petitioner was found to have a malignancy/monoclonal gammopathy. *Id.* Dr. Jerath noted immune stimulation "can aggravate" urticaria/angioedema because "cytokines and complement (inflammatory) mediators produced during this process can trigger mast cells." *Id.* However, she opined that malignancy/monoclonal gammopathy "does not represent a condition that would produce immune stimulation," although it "may have been the etiology of [Petitioner's] episodic urticaria/angioedema that was present pre-vaccination." *Id.*
- Petitioner experienced a "significant episode of urticaria/angioedema within [two] days" of receiving the flu vaccine in 2017. *Id.* "The timeline of this supports a correlation between the events, and indeed, as stated above, an immune stimulant such as a vaccine can bring on an episode, so it is a reasonable conclusion to draw that the vaccines caused the flare." *Id.* She added that Petitioner's treating doctors, such as Dr. Li, drew the same conclusion. *Id.*
- "Unlike previous episodes of urticaria/angioedema, however, this time [Petitioner's] symptoms did not become quiescent." *Id.* He went on to develop chronic and "debilitating" urticaria/angioedema that necessitates daily medication. *Id.*

[29] While a notice of filing was filed for this article, the actual article was never filed. *See* ECF No. 51.

Dr. Jerath finished her highlights of Petitioner's medical history with the following:

> While it is impossible to know whether or not [Petitioner] would have evolved into this chronic urticaria and angioedema anyway at some time in the future – perhaps due to his underlying HaT, perhaps due to his malignancy, perhaps just with time, what is clear is that he developed this aggravation of his condition in a temporal fashion that was correlated with his vaccine.

Pet'r's Ex. 19 at 2.

"Based on this logic," Dr. Jerath viewed this as a significant aggravation case. Pet'r's Ex. 19 at 2. Prior to vaccination, Petitioner experienced "a few episodes of urticaria and angioedema, but the episodes were self-limited and not ongoing." *Id.* Currently, Petitioner has chronic urticaria and angioedema "requiring daily medication for control." *Id.* at 3. Dr. Jerath opined this is a significant aggravation of his prior state because he "went from having self-limited episodes to chronic ongoing symptoms that require regular treatment." *Id.* Dr. Jerath explained that vaccinations "stimulate the immune system and can cause mast cells to be triggered resulting in urticaria/angioedema." *Id.* She added that Petitioner's doctors, including Dr. Li, also agreed that his symptoms "were likely due to the vaccine." *Id.* She further opined that Petitioner's symptoms "in the days following his vaccine" are temporally related. *Id.*

### 4. Dr. MacGinnitie Second Report

In Dr. MacGinnitie's second expert report, he primarily responded to Dr. Jerath's initial opinions. *See* Resp't's Ex. C. Dr. MacGinnitie understood Dr. Jerath's opinion to be that the flu vaccine "triggered significant worsening of [Petitioner's] pre-existing urticaria and angioedema, resulting i[n] changing from intermittent to chronic." *Id.* at 1. He understood her theory to be that "vaccination leads to production of 'cytokines and complement (inflammatory) mediators.'" *Id.* (quoting Pet'r's Ex. 19 at 2). Dr. MacGinnitie commented that like Dr. Byers, Dr. Jerath also did not provide any details for her theory, including "which cytokines are stimulated by vaccination, nor how they would lead to development of chronic urticaria." *Id.* at 1–2. Likewise, he also did not think Dr. Jerath explained why "short-lived cytokine production after vaccination would lead to ongoing urticaria, long after any putative inflammatory response to vaccination had resolved." *Id.* at 2.

Dr. MacGinnitie criticized Dr. Jerath for providing "no literature indicating the vaccine [Petitioner] received, [flu], can trigger CIU." Resp't's Ex. C at 2. First, regarding the COVID literature, Dr. MacGinnitie opined, that "[t]he fact that some patients have developed [CIU] after COVID vaccination does not demonstrate that [flu] vaccination can trigger this illness." *Id.* He provided two reasons: the literature provided data on acute urticaria, not chronic, and the COVID vaccine is different from the flu vaccine. *Id.* While Dr. MacGinnitie agreed that acute urticaria, "lasting a few days," was frequently seen after COVID vaccination, "cytokines are short-lived molecules and Dr. Jerath d[id] not provide a mechanism by which these would lead to persistent urticaria." *Id.* Additionally, Dr. MacGinnitie has not seen acute urticaria after flu vaccination, unlike the COVID vaccination. *Id.* Dr. MacGinnitie pointed out that the COVID vaccine described

in the literature "consists of RNA encoding the COVID spike protein, very different from the [flu] vaccine, which consists of purified protein from lab grown [flu] virus." *Id.*

Rather, Dr. MacGinnitie relied on literature he referenced to show that no trigger has been found in most patients with chronic urticaria, unlike acute episodes. Resp't's Ex. C at 2. The 2022 Lang[30] article wrote that "in acute urticaria, a cause such as drug, food, or infection can usually be identified, whereas in the chronic form, there is usually no identifiable cause." *Id.* (quoting Resp't's Ex. C, Tab 1 at 2). And Saini & Kaplan[31] wrote that "a search for an external 'cause' in CSU is a fruitless effort because the underlying abnormality is 'intrinsic.'" *Id.* (quoting Resp't's Ex. C, Tab 2 at 1). Dr. MacGinnitie noted that neither of these articles mention vaccination as a trigger of CIU. *Id.*

The 2022 Lang article described chronic urticaria as being "continuously or intermittently present for at least [six] weeks," in contrast with acute urticaria, "which is an episode of less than [six] weeks." Resp't's Ex. C, Tab 1 at 1. The authors described two iterations: spontaneous and "occur[ring] in an unprompted fashion," and inducible, which is "elicited by factors such as cold, heat, or pressure." *Id.* In chronic urticaria, "there is usually no identifiable cause." *Id.* at 2. Lang noted that patients with chronic urticaria may have an underlying systemic disorder or suffer from a preceding infection, although this is rare. *Id.* Chronic urticaria has been reported in association with neoplasms, particularly lymphoreticular cancers and other lymphoproliferative disorders. *Id.* at 4. Certain infections have also been identified as associated disorders, including "hepatitis B and C, Epstein–Barr virus infection, herpes simplex virus infection, mycoplasma infection, [and] Helicobacter pylori infection." *Id.* The author noted "the rarity of these associations, [and explained that due in part to costs,] routine and extensive laboratory testing has not been encouraged." *Id.* at 5. Lang concluded that while "various antibodies" are present in patients with chronic urticaria, "their etiologic, therapeutic, and prognostic value has not been determined." *Id.* at 6–7.

Saini & Kaplan distinguished between spontaneous and inducible chronic urticaria and explained that CSU can occur "independent of any exogenous stimulus, even if one can define circumstances that may worsen symptoms." Resp't's Ex. C, Tab 2 at 2. Thus, in cases of CSU, a "search for such an external 'cause' is fruitless because the underlying abnormality is 'intrinsic,' whether it is autoimmune, or some unknown process." *Id.* The authors noted that although "several theories exist regarding the pathogenesis of chronic urticaria, none have been conclusively established." *Id.* The wheals and angioedema in CSU "appear to involve the degranulation of skin mast cells, which release histamine, proteases, and cytokines with generation of platelet-activating factor and other arachidonic acid metabolites." *Id.* "These mediators induce vasodilatation, increase vascular permeability, and stimulate sensory nerve endings that lead to swelling, redness, and itch." *Id.* The authors echoed Lang's conclusion that "[t]he exact mechanism for mast cell activation in CSU is still not clear." *Id.* One autoimmune theory is that patients with CSU "express autoreactive IgE species that activate skin mast cells." *Id.* at 3. The authors reviewed a clinical trial which enrolled patients with CSU carrying IgE to thyroperoxide and showed a marked clinical benefit in a span of one to two weeks after initial treatment with omalizumab. *Id.* However, the

---

[30] David M. Lang, *Chronic Urticaria*, 387 NEW ENG. J. MED. 824 (2022).
[31] Sarbjit S. Saini & Allen P. Kaplan, *Chronic Spontaneous Urticaria: The Devil's Itch*, 6 J. ALLERGY & CLINICAL IMMUNOLOGY PRACTICE 1097 (2018).

rapid clinical response to omalizumab does not fit the timing of reduction in skin mast cell IgE receptors, leaving "open the validity of this proposed pathogenic auto-IgE mechanism." *Id.* The authors concluded that future considerations are needed in determining a pathogenesis. *Id.* at 4. "The 'autoimmune' considerations based on positive autologous skin test results or plasma factors that activate cells in vitro require identification of the agent responsible; otherwise, its importance cannot be discerned." *Id.* Additionally, the "idea of IgE antibody to any autoantigen needs further work regarding what such an autoantigen might be with appropriate controls for disease specificity, its location within skin, and distinction from a more general autoimmune response due to dysregulated B lymphocytes." *Id.*

Saini & Kaplan also discussed another proposed "pathway for tissue mast cell activation." Resp't's Ex. C, Tab 2 at 2. Recognizing the evidence for "coagulation system activation," the authors reviewed a study that "demonstrated that intravascular histamine release along with an infection stimulus producing Toll-like receptor activation . . . can synergize to stimulate endothelial cells to express tissue factor and thereby provide stimulus for coagulation system activation." *Id.* at 2–3. They further proposed that "this may provide for plasma extravasation and downstream activation of skin mast cells via protease-activated receptors." *Id.* at 3. "This pathway could explain the rapid appearance of urticaria lesions in association with bacterial and other viral infections." *Id.* They concluded that this thesis, "although novel, relates to the onset of the process but is unlikely to explain the chronicity that lasts months to years." *Id.*

Finally, Dr. MacGinnitie did not agree with Dr. Jerath that Dr. Li attributed Petitioner's urticaria to his vaccination. Resp't's Ex. C at 2. Dr. Li notated, "we discussed consideration that this may be related to his previous [flu] immunization but this link cannot be made with certainty at this time." *Id.* (quoting Pet'r's Ex. 3 at 55). Dr. MacGinnitie interpreted this to be "considering vaccination as a possible trigger, but not having enough information to draw a firm conclusion." *Id.* at 3.

**5. Dr. Jerath's Second Report**

In her second expert report, Dr. Jerath confirmed with Dr. MacGinnitie that "no specific etiology can be found" in chronic urticaria and angioedema. Pet'r's Ex. 23 at 1. However, she opined it is "well established that certain conditions that stimulate the immune system (e.g., infection, autoimmune diseases, malignancy) can be associated with urticaria/angioedema." *Id.* Indeed, she explained that her diagnostic workup for patients presenting with urticaria is "excluding such underlying implicated conditions." *Id.* She also noted that she "know[s] that many patients who present with urticaria/angioedema can implicate an antecedent viral infection prior to the onset of their condition." *Id.* But, as is often the case in medicine, "[w]e do not know the exact mechanism by which this happens." *Id.*

It is for these reasons that Dr. Jerath "cannot name the specific cytokine that is implicated." Pet'r's Ex. 23 at 1. "We do not know what specific molecule was involved, but there is a general consensus amongst those of us that take care of large numbers of patients with this condition that chronic urticaria/angioedema represents immune activation gone awry (or with a bystander fall-out effect)." *Id.* She stated she has "taken care of hundreds of patients with chronic urticaria/angioedema who have been found to have hyperthyroidism, some other autoimmune

process, and infection, or a malignancy, which when treated, has ameliorated their urticaria/angioedema." *Id.* At the same time, Dr. Jerath opined that "[v]accines are designed to stimulate the immune system[,] and it is not a stretch to say that it can produce a spate of urticaria or an episode of angioedema in someone with the appropriate predisposition." *Id.*

Dr. Jerath also reiterated that while Petitioner's malignancy/monoclonal gammopathy "does not represent a condition that would produce immune stimulation," it "may have been the etiology of his episodic urticaria/angioedema that was present pre-vaccination." Pet'r's Ex. 23 at 1. She added in this expert report that "it is likely the interplay of the immune stimulation from the vaccine against the backdrop of [Petitioner's] malignancy that resulted in his condition." *Id.* at 2. Dr. Jerath opined this is "supported by the fact that he had a significant aggravation immediately after vaccination, but it improved dramatically with the treatment of his malignancy." *Id.*

### 6. Dr. MacGinnitie's Third Report

In his third responsive report, Dr. MacGinnitie reiterated that "reviews on [CIU] note that extensive testing is not indicated, as the condition is typically intrinsic (that is due to underlying mast cell activation, not the result of some extrinsic trigger)." Resp't's Ex. D at 1. Like Dr. Jerath, he also shared that in his experience, some patients with CIU report a viral illness around the time of onset. *Id.* However, given that viral infections are very common, "it is not clear if the illness is truly a trigger or [if] the association is coincidental." *Id.*

Dr. MacGinnitie noted that guidelines from both the United States' and European allergy societies "do no[t] recommend that patients with CIU avoid vaccination or note them as a trigger, indicating the consensus among providers caring for this illness that vaccination is safe and not thought to incite or worsen urticaria." Resp't's Ex. D at 2. Dr. MacGinnitie also cares for patients with CIU and recommends they receive indicated vaccines. *Id.* He stated this is consistent with Petitioner's treating provider, Dr. Bonnin, who noted Petitioner should continue to receive seasonal flu vaccines. *Id.* (citing Pet'r's Ex. 11 at 26).

### 7. Dr. Jerath's Third Report

In her third and final expert report, Dr. Jerath expanded on her theory. Pet'r's Ex. 27. First, she cited Zuberbier et al. for the explanation that urticaria/angioedema "is a manifestation of mast cell degranulation resulting from pre-formed and rapidly synthesized mediators that are released by mast cells when they are signaled or activated." *Id.* at 1 (citing Pet'r's Ex. 28). Zuberbier et al. is an "update and revision of the international guidelines for urticaria." Pet'r's Ex. 28 at 3. Dr. Jerath also cited Hiragun et al.[32] *Id.* at 2 (citing Pet'r's Ex. 31). Hiragun et al. studied the prognosis and natural course of chronic urticaria. Pet'r's Ex. 31. Of relevance, they commented that "[s]everal reports have indicated that IgG antibodies to IgE and/or those to the high-affinity IgE receptor play a role in the mechanism for activation of cutaneous mast cells and blood basophils in up to 50% of the patients with CSU." *Id.* at 1. Dr. Jerath also commented that CSU is "a waxing and waning condition." Pet'r's Ex. 27 at 2.

---

[32] M. Hiragun et al., *Prognosis of Chronic Spontaneous Urticaria in 117 Patients Not Controlled by a Standard Dose of Antihistamine*, 68 ALLERGY 229 (2013).

Dr. Jerath then explained a distinction between acute and chronic urticaria: potential etiologies. Pet'r's Ex. 27 at 1. "For patients who present with acute urticaria (lifetime prevalence of 20%), we will search for a potential allergenic trigger." *Id.* For patients presenting with chronic urticaria, she stated she no longer focuses on an allergic etiology because if there was one, it would have been evident over the course of six weeks (the time it takes for a condition to be considered chronic). *Id.* "When working up chronic urticaria, we look for underlying systemic conditions that may be activating mast cells (autoantibodies, underlying infection, malignancy, etc.)." *Id.* She stated, however, that most of the time, "we are not able to isolate a specific cause and we call this condition [CSU]." *Id.* Dr. Jerath wrote, "[w]hile we do not know the cause, we assume that something is keeping the mast cells in this activated state, but in CSU cases, we cannot specify what." *Id.* at 1–2.

Nonetheless, Dr. Jerath proposed that the activation of urticaria/angioedema can be the result of:

> a. cross-linking of allergen specific antibodies (IgE antibodies) mounted on the surface of mast cells which is what happens when you are allergic to something (meaning you have the IgE antibodies to it from a prior exposure) and then get exposed to it (this is what happens when a peanut-allergic person eats a peanut or a penicillin-allergen person gets penicillin).
> b. other triggers for mast cell activation, such as autoantibodies (like in thyroid disease) or cytokines and complement fragments that are created in the context of other activation of the immune system.
> c. autoantibodies thought to be directed against the mast cell (anti FceR1a or against IgE), a condition called chronic autoimmune urticaria.
> d. direct action of certain drugs on mast cells, as is the case with opiates and radiologic contrast media.

Pet'r's Ex. 27 at 1. She also opined that "[v]accines stimulate the immune system, and as such, can trigger urticaria." *Id.* at 2. In addition to her previously noting that this has been reported after COVID vaccines, she cited Tan & Grattan[33] for the proposition that this has "also been reported with a broad array of other vaccines, including [flu]." *Id.* (citing Pet'r's Ex. 29). Tan & Gratton reviewed drug-induced urticaria ("DIU"), including, but not limited to, antibiotics and anti-inflammatories. *See generally*, Pet'r's Ex. 29. Additionally, the article included vaccines as a class of drugs. *See id.* at 9 tbl.3, 10. They found vaccines to be "the third commonest cause of DIU . . . over a wide range of agents," including flu. *Id.* at 10. The authors wrote that the mechanism for the "development of urticaria developing after vaccination is unclear." *Id.* "In some individuals, immediate urticaria due to Type 1 hypersensitivity might follow previous exposure to the vaccine or a component of it. A more common story is for acute or chronic urticaria to commence within days or weeks of vaccination." *Id.* Tan & Gratton found it "more likely that the immunological reaction to the vaccine in some way promotes urticaria, perhaps by unmasking latent histamine-releasing autoantibodies, stimulating their production, or by immunological crossreactivity with natural anti-FcεRIα autoantibodies." *Id.*

---

[33] Eunice KH Tan & Clive EH Grattan, *Drug-Induced Urticaria*, 3 OP. DRUG & SAFETY 471 (2004).

Dr. Jerath has "also seen vaccines cause flares in patients . . . who have pre-existing CSU (i.e., an uptick in activity)." Pet'r's Ex. 27 at 2. However, she opined that "[i]f you have a patient who develops urticaria after a vaccine and then it persists beyond [six] weeks, there is no way to know if they had latent CSU that has been unmasked by the vaccine. There are no lab tests to find out either." *Id.* "Even if we can demonstrate the existence of auto antibodies, unless we know that they were not there prior to vaccination, there is no way to implicate the vaccine as the cause (auto antibodies can be present without causing symptoms)." *Id.*

Here, Dr. Jerath opined that Petitioner's symptoms "came on a few days after vaccination," which is "too soon for the formation of *de novo* antibodies (adaptive immune response) – autoimmune or otherwise." Pet'r's Ex. 27 at 3. She opined it "corresponds more closely with immune activation by the vaccine (innate immune response) with the generation of cytokines and other inflammatory mediators that may have triggered his mast cells and produced urticaria." *Id.* But "[w]hether he was prone to this activation given his underlying MGUS or his [HaT], one cannot know." *Id.*

#### 8. Dr. MacGinnitie's Fourth Report

In Dr. MacGinnitie's fourth and final expert report, he commented that Dr. Jerath "accurately summarize[d] known triggers of mast-cell degranulation, noting that chronic urticaria [] and angioedema [are] accepted to occur secondary to ongoing activation of skin mast cells." Resp't's Ex. E at 1. Dr. MacGinnitie again acknowledged the studies on chronic urticaria and the COVID vaccine but opined, "it does not follow that all vaccine can trigger [chronic urticaria]." *Id.*

Dr. MacGinnitie reiterated that Petitioner "had urticaria and angioedema, which typically exist on a spectrum, before vaccination." Resp't's Ex. E at 2. "Dr. Jerath propose[d] that activation of the innate immune system is the likely trigger in this case, as [in Petitioner's] case as he had worsening of his urticaria within forty-eight hours of vaccination." *Id.* However, Dr. MacGinnitie again stated that Dr. Jerath provided "no details, such as which 'cytokines and other inflammatory mediators' are generated by vaccination and lead to mast cell activation." *Id.* While he agreed that the flu vaccine does "trigger activation of the innate immune system, this activation is typically short-lived, resolving within a few days, and leads to mild symptoms in a minority of recipients such as local pain, swelling, headache, and malaise." *Id.* He opined, "Dr. Jerath provide[d] no mechanism by which this would lead to persistent worsening of [chronic urticaria]." *Id.* He concluded that Petitioner's CIU was "unrelated" to the receipt of his flu vaccination. *Id.*

## V. Applicable Legal Standards

### A. Standard of Adjudication—Burden of Proof

The Vaccine Act was established to compensate vaccine-related injuries and deaths. § 10(a). "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" *Rooks v. Sec'y of Health & Hum. Servs.*, 35 Fed. Cl. 1, 7 (1996) (quoting H.R. Rep. No. 908 at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioner's burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury. *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991).

**B. Standard of Adjudication—Factual Issues**

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding his claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records).

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325–26 (Fed. Cir. 2006) (citing *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1280 (Fed. Cir. 2005)). Indeed, when reviewing the record, a special master must consider the opinions of treating physicians. *Capizzano*, 440 F.3d at 1326. This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

While a special master must consider these opinions and records, they are not "binding on the special master or court." § 13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.* There is no presumption that medical records are accurate and complete as to all the patient's physical conditions. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021) (finding that "[b]ecause a reasonable fact finder could conclude that [Petitioner's] testimony [wa]s not inconsistent with her medical records . . . it was not arbitrary and capricious for the special master to credit [Petitioner's] testimony" over her medical records).

Where there are inconsistencies, special masters are within their discretion to award contemporaneous medical records greater weight than later conflicting testimony. *See Cucuras,* 993 F.2d at 1528 (holding that the special master's reliance on contemporaneous medical records over conflicting oral testimony given after the fact was not arbitrary or capricious); *see also Burns*, 3 F.3d at 417 (holding that the decision of whether to accord greater weight to contemporaneous medical records or later given testimony is "uniquely within the purview of the special master"). Indeed, the Court of Federal Claims has outlined four potential explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to

recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *LaLonde v. Sec'y of Health & Hum. Servs.,* 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).

Despite the weight afforded to medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Valenzuela v. Sec'y of Health & Hum. Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Hum. Servs.*, No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) ("[Section 13(b)(2)] must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by them." (emphasis omitted)).

### C. Standards for Adjudication—Causation

To receive compensation through the Program, Petitioner must prove either (1) that he suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that he received, or (2) that he suffered an injury that was actually caused by a vaccination. *See* §§ 11(c)(1), 13(a)(1)(A); *Capizzano*, 440 F.3d at 1319–20. Because Petitioner does not allege he suffered a Table Injury, he must prove a vaccine he received caused his injury. To do so, Petitioner must establish, by preponderant evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278.

A petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *See Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548–49. A petitioner is not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge[] the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano,* 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278–81; *see also Moberly*, 592 F.3d at 1322. Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano*, 440 F.3d at 1325. However, Petitioner cannot establish entitlement to compensation based solely on his assertions; rather, a vaccine claim must be supported either by medical records or by the opinion of a medical doctor. § 13(a)(1). Furthermore, as the Federal Circuit has made clear, "simply identifying a 'plausible'

theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Testimony that merely expresses the possibility—not the probability—is insufficient, by itself, to substantiate a claim that such an injury occurred. *See Waterman v. Sec'y of Health & Hum. Servs.*, 123 Fed. Cl. 564, 573–74 (2015) (denying Petitioner's motion for review and noting that a possible causal link was not sufficient to meet the preponderance standard). While certainty is by no means required, a possible mechanism does not rise to the level of preponderance. *Moberly*, 592 F.3d at 1322; *see also de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1351 (Fed. Cir. 2008). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322.

Next, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418 F.3d at 1279. A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). In particular, Petitioner must prove that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *see also Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). The received vaccine, however, need not be the predominant cause of the injury. *Shyface*, 165 F.3d at 1351. The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the vaccination." 2004 WL 1717359, at *4 (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.,* 9 F.3d 958, 961 (Fed Cir. 1993) (citation omitted).

Lastly, a petitioner must show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d at 1278. For example, if a petitioner's theory involves a process that takes several days to develop after vaccination, an injury that occurred within a day of vaccination would not be temporally consistent with that theory. Conversely, if the theory is one that anticipates a rapid development of a reaction post-vaccination, the development of the alleged injury weeks or months post-vaccination would not be consistent with that theory. *See de Bazan*, 539 F.3d at 1352. Causation-in-fact cannot be inferred from temporal proximity alone. *See Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992); *Thibaudeau v. Sec'y of Health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983) ("[w]ithout more, [a] proximate temporal relationship will not support a finding of causation").

### D. Standards for Adjudication—Significant Aggravation

Additional analysis is required to determine whether Petitioner's vaccination significantly aggravated her pre-existing injury. The elements of an off-Table significant aggravation case are set forth in *Loving*. *See Loving ex rel. Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135, 142–44 (2009); *see also W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (holding that "the *Loving* case provides the correct framework for evaluating off-table

significant aggravation claims"). The *Loving* court combined the *Althen* test, which defines off-Table causation cases, with a test from *Whitecotton*. *Whitecotton v. Sec'y of Health & Hum. Servs.*, 17 F.3d 374 (Fed. Cir. 1994), *rev'd sub nom.*, *Shalala v. Whitecotton*, 514 U.S. 268 (1995) (concerning on-Table significant aggravation cases). The resultant test has six components, which are:

> (1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a 'significant aggravation' of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significant worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

*Loving*, 86 Fed. Cl. at 144.

The statute defines "significant aggravation" as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration in health." § 33(4).

In determining whether Petitioner is entitled to compensation, the special master shall consider all materials in the record, including "any . . . conclusion, [or] medical judgment . . . which is contained in the record regarding . . . causation." § 13(b)(1)(A). The undersigned must weigh the submitted evidence and the testimony of the parties' proffered experts and rule in Petitioner's favor when the evidence weighs in her favor. *See Moberly*, 592 F.3d at 1325–26 ("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence."); *Althen*, 418 F.3d at 1280 (noting that "close calls" are resolved in Petitioner's favor). A petitioner who satisfies her burden is entitled to compensation unless Respondent can prove, by a preponderance of the evidence, that the vaccinee's injury is "due to factors unrelated to the administration of the vaccine." § 13(a)(1)(B). However, if a petitioner fails to establish a prima facie case, the burden does not shift. *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

In considering the reliability of a petitioner's evidence of a prima facie case, the special master may consider alternative causes for a petitioner's condition that are reasonably raised in the record, even if the respondent does not pursue a formal alternative cause argument. *Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349, 1358 (Fed. Cir. 2010). Thus, in weighing a petitioner's case-in-chief, a special master may consider evidence that the petitioner's alleged injury could have been caused by alternative causes. *Id.*

### E. Standards for Adjudication—Alternative Causation

A petitioner who satisfies all three prongs of the *Althen* test (or all six prongs of the *Loving* test) has established a prima facie showing of causation. *Hammitt ex rel. Hammitt v. Sec'y of*

*Health & Hum. Servs.*, 98 Fed. Cl. 719, 726 (2011). Where a petitioner demonstrates by a preponderance of the evidence that she suffered an injury caused by vaccination, the government must not merely prove the existence of an alternative cause, but that such an alternative actually caused the injury. *Knudsen,* 35 F.3d at 549. Additionally, a factor unrelated "may not include 'any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition.'" § 13(a)(2); *see also Doe*, 601 F.3d 1349 (opining that an idiopathic diagnosis cannot be a "factor unrelated," as it is idiopathic).

"Regardless of whether the burden ever shifts to the [R]espondent, the special master may consider the evidence presented by the [R]espondent in determining whether the [P]etitioner has established a prima facie case." *Flores v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 157, 162–63 (2014); *see also Stone v. Sec'y of Health & Hum. Servs.*, 676 F.3d 1373, 1379 (Fed. Cir. 2012) ("[E]vidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question."); *de Bazan*, 539 F.3d at 1353 ("The government, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the [P]etitioner's evidence on a requisite element of the [P]etitioner's case-in-chief."); *Pafford*, 451 F.3d at 1358–59 ("[T]he presence of multiple potential causative agents makes it difficult to attribute 'but for' causation to the vaccination. . . . [T]he Special Master properly introduced the presence of the other unrelated contemporaneous events as just as likely to have been the triggering event as the vaccinations.").

## VI. Discussion[34]

### A. *Loving* Factor One: What was Petitioner's Condition Prior to Administration of the Vaccine?

Petitioner went to the ED three weeks prior to vaccination for urinary problems and was prescribed Flomax and finasteride. On December 19, 2017 (three days post vaccination), Petitioner presented to his PCP for "edema since starting Flomax." Pet'r's Ex. 4 at 275. He presented with "feet swelling after taking Flomax and finasteride." *Id.* Dr. Hussain noted that Petitioner had a "[h]istory of similar episodes of urticaria." *Id.* In his declaration, Petitioner explained that when he "reported this to Dr. Hussain[, he] was referring to an incident in 1999 or 2000 when [he] was given the drug Duricef and had an allergic reaction." Pet'r's Ex. 25 at ¶ 7.

Thus, prior to vaccination, Petitioner had two instances of what appear to be drug-induced urticaria/angioedema as described by Tan & Gratton. Nothing in Petitioner's medical record conflicts with the conclusion that his DIU episode in 1999 or 2000 was an allergic reaction to Duricef and "self-limited," as described by Dr. Jerath. The parties dispute whether the second instance, following the Flomax and finasteride, resolved prior to vaccination or was ongoing. Dr. Jerath referred to Petitioner's proposed finasteride-associated angioedema as "self-limited" and

[34] Throughout my discussion, I refer to Petitioner's current condition as chronic urticaria. All of the experts agree with this diagnosis. *See* Pet'r's Ex. 13 at 6 (Dr. Byers opining the proper diagnosis is chronic urticaria and angioedema); Pet'r's Ex. 19 at 3 (Dr. Jerath opining Petitioner has chronic urticaria and angioedema); Resp't's Ex. A at 8–9 (Dr. MacGinnitie opining Petitioner's underlying diagnosis is CIU and angioedema).

"not ongoing." Pet'r's Ex. 19 at 2. Dr. MacGinnitie averred generally that Petitioner's chronic urticaria and angioedema started prior to the December 16, 2017 flu vaccination.

While admitted to the hospital, on December 20, 2017, Petitioner "endorse[d] lesions were started on his bilateral plantar foot areas at different times the last [two] weeks which were resolving on its own." Pet'r's Ex. 2 at 829. A separate notation indicated that he had "development of symptoms in []his bilateral feet . . . which started prior to flu shot administration. Those areas have been resolving." *Id.* at 828. This record reveals that Petitioner suffered from edema on his feet prior to vaccination, but it does not clarify when the resolution began. However, Petitioner presented with this complaint as ongoing when he presented to his PCP on December 19, 2017, three days after vaccination. *See* Pet'r's Ex. 4 at 275 ("edema since starting Flomax" three weeks prior, "feet swelling after taking Flomax and finasteride"). Therefore, this second episode had not resolved prior to vaccination. Pursuant to the medical records, Petitioner had, at a minimum, feet swelling since starting Flomax and Finasteride three weeks prior to vaccination.

### B. *Loving* Factor Two: What is Petitioner's Current Condition (or His Condition Following the Vaccination, if Also Pertinent)?

Petitioner received the flu vaccine on December 16, 2017. Three days later, in addition to reporting the foot swelling indicated above, Petitioner reported that after receiving the flu shot on Saturday, his "left hand ha[d] since swollen up and [was] red since waking up [that] morning." Pet'r's Ex. 4 at 275. There was also swelling on his right upper arm. A review of symptoms was positive for a blister between left big toe, "[r]edness from the left hand spreading to the left forearm," and "[s]welling and hive-like rash on right inner arm." *Id.* at 276. Examination showed edema on left hand, bruise on left thumb, edema and redness on upper inner right arm, and erythema of left hand and forearm. *Id.* at 277. Later that evening, on December 19, 2017, Petitioner presented to the ED complaining of a "sudden onset" of left-hand swelling, erythema, and tenderness to palpation that began the previous day (December 18, 2017). Pet'r's Ex. 2 at 647. Notes also indicated "[s]ymptoms started earlier this morning and progressed throughout the day." *Id.* at 654. ED notes stated, "[o]f interest, he also has an area of erythema and tenderness to his right upper arm/bicep. State[d] this area appeared at the same time that his left hand began to swell." *Id.* at 647. He "endorse[d] a flu shot to that arm [three] days ago." *Id.*

Thereafter, Petitioner was hospitalized from December 19 to December 21, 2017, for further evaluation. On December 20, 2017, it was noted that finasteride was discontinued. During his hospitalization, Petitioner continued to have swelling, itching, erythema, and urticaria on his left hand and arm. His right foot and thigh were also erythematous. His discharge diagnosis was left-hand swelling extending to the left upper arm, concerning for cellulitis but appearing "more allergic in nature," and urticaria with no specific location. Pet'r's Ex. 2 at 673. Petitioner's foot swelling resolved within a week of his hospital discharge, but he continued to seek treatment for symptoms of urticaria and angioedema affecting his upper extremities with his PCP and allergist. Ultimately, his urticaria was categorized as chronic by his treaters. Petitioner saw nephrologist Dr. Ambalavaman in 2018, where Petitioner reported a "delayed allergic reaction to flu vaccination" "in the form of swelling of his upper extremity and skin rash." Pet'r's Ex. 5. At 5–6. His symptoms were being treated with antihistamines and oral steroids and recurred when either medication was discontinued. He now uses Xolair which controls his condition.

There is no dispute about Petitioner's post-vaccination and current condition. When Petitioner first presented to his PCP after vaccination, the diagnosis was cellulitis of his left hand and arm as well as urticaria. There was no assessment made regarding his feet symptoms. Likewise, his hospitalization discharge diagnosis was left hand and arm swelling and urticaria, with no mention of his feet symptoms. These feet symptoms did not extend beyond six weeks and do not appear to have influenced Petitioner's chronic urticaria or CSU diagnosis. The experts and Petitioner's doctors agreed that after receiving the vaccine, Petitioner developed redness, itching, and swelling to his hands and arms, and continued to have intermittent episodes consistent with a chronic presentation of urticaria and angioedema.

### C. *Loving* Factor Three: Does Petitioner's Current Condition (or Condition After Vaccination) Constitute a "Significant Aggravation" of His Condition Prior to Vaccination?

To determine whether there is a "significant aggravation" of Petitioner's condition, it is necessary to compare his condition before vaccination to his condition after vaccination. The statute defines "significant aggravation" as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration in health." § 33(4).

Dr. Jerath opined that Petitioner's current condition is a significant aggravation of his prior condition because he "went from having self-limited episodes to chronic ongoing symptoms that require regular treatment." Pet'r's Ex. 19 at 3. She explained that prior to vaccination, Petitioner experienced "a few episodes of urticaria and angioedema, but the episodes were self-limited and not ongoing." *Id.* at 2. Petitioner had a "significant episode of urticaria/angioedema within [two] days" of vaccination. *Id.* But "[u]nlike previous episodes of urticaria/angioedema, however, this time [Petitioner's] symptoms did not become quiescent." *Id.* He went on to develop chronic and "debilitating" urticaria/angioedema that necessitates daily medication. *Id.* Currently, Petitioner has chronic urticaria and angioedema "requiring daily medication for control." *Id.* at 3.

Prior to vaccination, Petitioner's complaints were limited to his feet and primarily consisted only of swelling. Immediately prior to vaccination, Petitioner did not have a diagnosis related to urticaria or angioedema, despite reporting feet swelling for three weeks since starting Flomax and finasteride. Approximately two days after vaccination, Petitioner began reporting symptoms on his left hand and upper arm that included swelling, edema, erythema, and itching. This is a different area than his pre-vaccination symptoms (feet vs. upper extremities) and involved different symptoms (edema vs. urticaria). The medical records consistently indicated that the symptoms on Petitioner's hands and arms did not manifest until after vaccination. Hospital records also noted Petitioner had an episode involving his feet prior to vaccination, but that it had been resolving.

Thus, in the days after vaccination, none of Petitioner's treating doctors characterized Petitioner's foot swelling as urticaria. The foot swelling was mentioned collectively with Petitioner's other symptoms, including hand swelling, later in the records, but it was not used contemporaneously for diagnostic purposes. There are no specific diagnoses regarding his feet symptoms in the days after vaccination. Petitioner and his providers attributed his foot swelling to

his use of Flomax and finasteride. *See e.g.*, Pet'r's Ex. 4 at 275 ("edema since starting Flomax" three weeks prior, "feet swelling after taking Flomax and finasteride"); Pet'r's Ex. 2 at 828 ("Other possible etiology could be the finasteride with development of symptoms in []his bilateral feet on the plantar surface which started prior to flu shot administration. Those areas have been resolving."). Even Dr. Jerath conceded that Petitioner's pre-vaccination foot swelling was "potentially attributed to finasteride." Pet'r's Ex. 19 at 2. Further, Petitioner subsequently stopped taking these medications and those symptoms resolved.

Although his overall condition post vaccination is markedly worse than pre vaccination, the evidence in the record supports that Petitioner's pre-vaccination foot swelling was separate and apart from Petitioner's post-vaccination hand symptoms that were identified as urticaria. Therefore, Petitioner has not met his burden to establish his burden pursuant to *Loving*, however, the causation-in-fact claim remains.

### D. *Althen* Prong One: Medical Theory of Causation

All of the experts agreed that the exact mechanism of chronic urticaria is unknown. *See* Pet'r's Ex. 23 at 1. The literature filed by Respondent provides helpful information on the disease and the suggested pathogenesis. Saini & Kaplan explained that CSU can occur "independent of any exogenous stimulus even if one can define circumstances that may worsen symptoms." Resp't's Ex. C, Tab 2 at 2. The authors noted that although "several theories exist regarding the pathogenesis of chronic urticaria, none have been conclusively established." *Id.* The wheals and angioedema in CSU "appear to involve the degranulation of skin mast cells, which release histamine, proteases, and cytokines with generation of platelet-activating factor and other arachidonic acid metabolites." *Id.* "These mediators induce vasodilatation, increase vascular permeability, and stimulate sensory nerve endings that lead to swelling, redness, and itch." *Id.* "The exact mechanism for mast cell activation in CSU is still not clear." *Id.* The 2022 Lang article wrote that while "various antibodies" are present in patients with chronic urticaria, "their etiologic, therapeutic, and prognostic value has not been determined." Resp't's Ex. C, Tab 1 at 6–7.

Both Dr. Byers and Dr. Jerath proposed cytokine production as the theory for causation. Dr. Jerath noted that the immune stimulation "can aggravate" urticaria/angioedema because "cytokines and complement (inflammatory) mediators produced during this process can trigger mast cells." Pet'r's Ex. 19 at 2. Dr. MacGinnitie took two main issues with the cytokine theory; the first being the lack of specificity of what cytokines are involved. Dr. Jerath admitted she cannot name the specific cytokine involved. Such specificity, however, is not required by petitioners to be successful in the Program.

The second issue Dr. MacGinnitie took with the cytokine theory is how cytokines, which are short-lived, can lead to ongoing disease or more specifically, chronic urticaria. Dr. MacGinnitie agreed that flu vaccines can trigger activation of the innate immune system but argued "this activation is typically short-lived, resolving within a few days." Resp't's Ex. E at 2. Given that Petitioner's symptoms lasted over six weeks, there is not persuasive evidence in the record that a biological mechanism for acute urticaria would be relevant here.

Dr. Jerath pointed out that one distinction between acute and chronic urticaria is potential etiologies. She opined that in patients presenting with acute urticaria, she searches for a potential allergic trigger. But in chronic urticaria, she searches for an underlying systemic condition that activates the mast cells. And because "[v]accines are designed to stimulate the immune system," Dr. Jerath opined that they can produce urticaria or angioedema "in someone with the appropriate predisposition." Pet'r's Ex. 23 at 1.

Petitioner filed Tan & Gratton, which noted vaccines to be "the third commonest cause of DIU . . . over a wide range of agents," including flu. Pet'r's Ex. 29 at 10. They found post-vaccination *chronic* urticaria to be the "more likely" result of the immunological reaction to the vaccine "perhaps by unmasking latent histamine-releasing autoantibodies, stimulating their production, or by immunological crossreactivity with natural anti-FcεRIα autoantibodies." *Id.* Thus, once an underlying systemic condition (even if it is unknown) is activated, it can remain ongoing producing the presentation of chronic urticaria. Despite filing an expert report after Dr. Jerath cited Tan & Gratton, Dr. MacGinnitie did not offer a response to this article and instead continued to argue that there is no evidence of a mechanism that would lead to CSU. Further, as shown in Saini & Kaplan, cited by Respondent, CSU in association with bacterial and viral infections has been contemplated by the medical and scientific community.

In his motion for a ruling on the record, Petitioner relied on the Mohanty et al. article for additional support that post-vaccination cytokine production is prolonged. Pet'r's Mot. at 25; Pet'r's Ex. 32. This article was not referenced nor discussed by either of Petitioner's experts. This article was filed for the first time simultaneously with Petitioner's motion for a ruling on the record. Mohanty et al. evaluated human monocyte function before flu vaccination and at days two, seven, and 28 after vaccination in young and older adults to "better understand the effects of aging innate immune responses to the trivalent inactivated [flu] vaccine." Pet'r's Ex. 32 at 6. They found cytokine production of CD14+ CD16+ inflammatory monocytes at days two and seven post vaccination, with a return to baseline by day 28. *Id.* This provided "evidence for sustained innate immune engagement after immunization that extends until at least day 28." *Id.* at 7. This article shows that flu vaccination can stimulate cytokine production; it does not help or hurt Petitioner's claim for chronic urticaria since they only studied cytokine production up to 28 days, which is less than the six-week duration required for chronic urticaria.

While Petitioner's motion for a ruling on the record does not appear to rely on Dr. Byers' opinions, she did not provide any support for her assertion that "the immune challenge from the [flu] vaccine[] caus[ed] an autoimmune reaction generating IgE." Pet'r's Ex. 13 at 6. However, Dr. Jerath, in mentioning proposed theories of urticaria, noted IgE as antibodies that might activate mast cells. Tan & Gratton, as discussed above, supports this mechanism. Moreover, Saini & Kaplan wrote that one autoimmune theory is that patients with CSU "express autoreactive IgE species that activate skin mast cells." Resp't's Ex. C, Tab 2 at 3.

I note that this case is a close call; however, such instances lean in favor of petitioners. Here, Petitioner has presented preponderant evidence that cytokine upregulation leads to mast cell degranulation, which leads to the development of urticaria. And the literature provides more information specifically as it relates to Respondent's main point of contention—chronicity. Respondent did not rebut this evidence. Therefore, reviewing all of the evidence presented, I find

Petitioner has presented preponderant evidence that the flu vaccine can cause chronic urticaria, satisfying *Althen* prong one.

### E. *Althen* Prong Two: Logical Sequence of Cause and Effect

Dr. Jerath opined that Petitioner's presentation "corresponds [] closely with immune activation by the vaccine (innate immune response) with the generation of cytokines and other inflammatory mediators that may have triggered his mast cells and produced urticaria." Pet'r's Ex. 27 at 3.

Most of Petitioner's providers assessed, at least as a differential, the causal association between his flu vaccine and urticaria and/or the temporal association between his flu vaccine and urticaria. *See e,g.*, Pet'r's Ex. 2 at 828 (Dr. Sarvepalli's assessment was "[a]cute urticaria probably related to flu shot he received on 12/16. Other possible etiology could be the finasteride with development of symptoms in []his bilateral feet on the plantar surface which started prior to flu shot administration."); Pet'r's Ex. 2 at 671 (Dr. Polenakovik concluded Petitioner's left side cellulitis "preceded by urticaria presumed to be due to flu shot vs finasteride."); Pet'r's Ex. 2 at 673 (discharge diagnosis was urticaria, "most likely offending agent was recent flu shot (vs finasteride)"); Pet'r's Ex. 2 at 677 (attending physician stated that Petitioner's allergic reaction/urticaria was "likely [due to the] flu shot but could also be finasteride reaction" and recommended that Petitioner "not pursue flu shot administration in the future"); Pet'r's Ex. 4 at 296 (PCP noting "[i]t is suspected his allergic reaction was to the flu vaccination or starting finasteride since those events happened just prior to symptoms onset"); Pet'r's Ex. 4 at 275 (PCP writing that Petitioner received the flu shot on Saturday and his left hand "ha[d] since swollen up and [was] red"); Pet'r's Ex. 3 at 106 (Dr. Amin documenting Petitioner's symptoms started three days after he received the flu vaccine); Pet'r's Ex. 10 at 2 (Dr. Calvo noting Petitioner's reaction to the flu shot to be a "very unusual occurrence"); Pet'r's Ex. 10 at 33 (Dr. Calvo listing recurrent angioedema and urticaria as being "triggered by receiving a flu shot").

Importantly, Petitioner's allergist, Dr. Bonnin, diagnosed Petitioner with a possible vaccine reaction stating his "hypothesis [] that [Petitioner] had and perhaps keeps having serum sickness from his flu vaccine." Pet'r's Ex. 6 at 5. Dr. Bonnin noted that he "could be wrong and the [reaction] was not from [Petitioner's] vaccination" and that allergy testing for Type IV hypersensitivity reactions[35] to vaccines is not available. *Id.* Although at another visit, Dr. Bonnin wrote, "[t]he patient has received their annual flu shot [December 16, 2017]. Precisely that is what trigger[ed] his current problems." *Id.* at 13; *see also* Pet'r's Ex. 11 at 11 (Dr. Bonnin's assessment was chronic urticaria and "adverse effect of vaccine, sequela."). Further, allergist and immunologist Dr. Li concluded that "[a]n adverse reaction to the [flu] vaccine was considered a leading consideration, but this diagnosis cannot be made with certainty." Pet'r's Ex. 3 at 25. Dr. Li later diagnosed Petitioner with angioedema and urticaria, that "may be related to his previous [flu] immunization," but noted "this link cannot be made with certainty at this time." *Id.* at 55.

The opinions of Petitioner's treating physicians attributing his condition to vaccination are important because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'"

[35] Neither of Petitioner's experts proposed a theory on Type IV hypersensitivity reaction.

*Capizzano*, 440 F.3d at 1326. Here, the number of different providers, including specialists, attributing the flu vaccine to Petitioner's condition, even if just as a differential, is persuasive for actual causation.

Dr. Jerath contemplated the role of Petitioner's predisposition to chronic urticaria throughout her expert reports. She eventually came to the conclusion that "[w]hether [Petitioner] was prone to this [mast cell] activation given his underlying MGUS or his [HaT], one cannot know." Pet'r's Ex. 27 at 3. Dr. Byers opined Petitioner "was susceptible to this reaction due to his monoclonal IgM lambda gammopathy which promotes complement activation and by the Tyrosinemia which is thought to destabilize mast cells, which can promote swelling." Pet'r's Ex. 13 at 6.

The 2022 Lang article reported an association of chronic urticaria with neoplasms, particularly lymphoreticular cancers and lymphoproliferative disorders. Resp't's Ex. C, Tab 1 at 4. This is significant here where Petitioner was diagnosed with MGUS, CLL, and non-Hodgkin lymphoma; had a bone marrow biopsy result consistent with involvement by plasma cell neoplasm; and was suspected to have a lymphoproliferative disorder. *See* Pet'r's Ex. 2-1 at 1196; Pet'r's Ex. 6 at 34, 37–38; Pet'r's Ex. 10 at 7, 32–33. Dr. Jerath admitted that Petitioner's symptoms improved with the treatment of his malignancy. Pet'r's Ex. 23 at 2. However, there was no causal theory proposed for the association of chronic urticaria with neoplasms. Instead, this goes towards Petitioner's theory that vaccines can stimulate cytokines and subsequently mast cells leading to chronic urticaria in susceptible individuals. As to Petitioner's HaT, recent studies showed HaT is not associated with urticaria and Dr. MacGinnitie and Dr. Jerath agreed on this point. Resp't's Ex. A at 7; Pet'r's Ex. 19 at 2; *see also* Resp't's Ex. A, Tab 5.

For these reasons, I find Petitioner has shown a logical sequence of cause and effect, satisfying his burden under *Althen* prong two.

### F. *Althen* Prong Three: Proximate Temporal Relationship

Respondent argued that Petitioner's urticaria/angioedema started before vaccination and therefore did not provide any argument as to the reasonableness of post-vaccination timing. This is inconsistent with my above finding that Petitioner's chronic urticaria started after vaccination. Dr. Byers wrote that the onset of three days "is an appropriate time interval in this previously flu vaccinated individual." Pet'r's Ex. 13 at 6. She explained that since Petitioner had previously received flu vaccines, he was "well primed to produce a flood of cytokines to activate a variety of autoimmune reactions." *Id.*

Dr. Jerath referred to the onset of Petitioner's symptoms as two days after vaccination, a "few" days after vaccination, and "immediately after vaccination." *See* Pet'r's Ex. 23 at 1–2; Pet'r's Ex. 27 at 2. Dr. Jerath opined this is consistent with an innate immune response. Dr. MacGinnitie did not raise any dispute regarding the timing of an innate immune response. According to Dr. Jerath, "[t]he timeline of this supports a correlation between the events, and it is a reasonable conclusion to draw that the vaccine caused the flare." Pet'r's Ex. 23 at 1. The medical records preponderantly show onset was approximately two days post vaccination.

## VI. Conclusion

After a careful review of the record, and for the reasons discussed above, I find that Petitioner has established by preponderant evidence that the preexisting foot swelling, which was not diagnosed and resolved after stopping medications, was not related to the subsequent diagnosis of chronic urticaria, which manifested as upper extremity symptoms two days post vaccination. Accordingly, Petitioner did not present preponderant evidence of significant aggravation. Petitioner has, however, presented preponderant evidence that his December 16, 2017 flu vaccine caused his chronic urticaria/angioedema. Therefore, Petitioner is entitled to an award of compensation. A separate damages order will issue. Damages will be limited to his chronic urticaria/angioedema.

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master